Richard W. DANIELSON, Plaintiff,

v.

James J. FLETCHER, Administrator, National Aeronautics and Space Administration, Defendant.

No. C88–3941.

United States District Court, N.D. Ohio, E.D.

Aug. 7, 1991.

Andrew Margolius, Cleveland, Ohio, for plaintiff.

William Kopp, Lynne Buck, Asst. U.S. Attys., Cleveland, Ohio, for defendant.

## MEMORANDUM OF DECISION

BATTISTI, District Judge.

On June 4–6, 1991 a non-jury trial was conducted in the instant case pursuant to Federal Rule of Civil Procedure 39(b). At that time, the court heard the Plaintiff Richard W. Danielson's claim that the 1983 decision of a selecting officer at the National Aeronautics and Space Administration (NASA) not to promote him discriminated against him on the basis of his age. The Plaintiff alleges that this decision constituted a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and he seeks declaratory and injunctive relief, and an award of back pay.

Jurisdiction in the federal district court is predicated upon the alleged violations of the federal statute. 28 U.S.C. § 1331; 29 U.S.C. § 633(a).

## I. FINDINGS OF FACT

In accordance with Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact.

The Plaintiff was born on May 15, 1927. He graduated from Ohio University in 1950 with a Bachelor of Science degree. From 1954 through 1965 he earned 33 hours of credit towards a masters degree. He commenced his employment at the NASA Lewis Research Center [1] on June 26, 1963 when he was hired into the Procurement Division as a Contract Specialist, at a GS–12 pay grade. He was employed in the same position and at the same grade at the time of the alleged discrimination.

Essentially, the job of a Contract Specialist was to update previously negotiated contracts. The job required an individual to assimilate a great deal of information about a specific contract and to assess and communicate this information in the context of negotiations with outside contractors. Bradley Baker, the Plaintiff's first-line supervisor from August 1982 through May 1986, testified that although a Contract Specialist acted on behalf of a team at the negotiations, the position did not involve supervisory responsibilities.

In both March 1983 and March 1984 Baker rated Danielson's job performance for the prior year as "Highly Successful." *See* Joint Exhibits 6 & 7. "Highly Successful" was the second highest rating available and was to be employed for an individual who "[e]xceeds the performance requirements for the total position to a substantial degree." *Id.* As part of the March 1983 evaluation Baker stated: "Mr Danielson's performance as a contract specialist during the appraisal period has been highly satisfactory. He performs his assigned duties in a determined and purposeful manner. The quality of his work is good and the work is generally performed within agreed upon time schedules, unless impacted by outside forces." Joint Exhibit 6.

Baker also testified, however, that the ratings given were routinely inflated for all employees. He stated that prior to 1983, he had been instructed to be more generous in the determination of ratings. The alleged purpose for this was to keep morale high and to allow journeymen, like Danielson, to proceed to the selection interview stage of the hiring process. Along these lines, Baker testified that "Highly Successful" was the most widely used rating, and that he had never rated anyone as less than "Satisfactory."

Evaluating Danielson at the time of trial, Baker stated that he was a successful and wholly adequate contract specialist, but that he had several weaknesses which were relevant to his ability to become a Supervisory Contract Specialist. Foremost among these was a communications skills deficiency. Baker testified that Danielson had difficulty in making himself understood to both the line management within NASA and the outside contractors with whom he was negotiating.

Baker also described several disagreements that he had with Danielson in 1983 over negotiating strategy. He testified that he was forced to step into several

---

**1.** The Lewis Research Center is one of nine major NASA cites and employs over 2500 people.

negotiations because Danielson's approach was too passive.

Harlan Simon was the Plaintiff's second line supervisor at the time of the incidents in question. Simon and Danielson were both hired as contract specialists by NASA in 1963. Between 1963 and 1985 Simon was promoted to supervisory contract specialist, and eventually, branch chief. He worked with the Plaintiff when both were contract specialists, was his first line supervisor for three years, and then became his second line supervisor.

During his testimony, Simon described the crucial interaction between the procurement personnel and the various technical engineering groups within NASA, at one point describing the scientists and engineers as "clients" of the procurement staff. Simon stressed that Danielson was a hardworking, dedicated professional who consistently accomplished the tasks assigned to him. He also stated, however, that Danielson was deliberate and methodical to the point of being frustrating. In addition, he testified that the technical personnel often found Danielson to be unresponsive and even obtuse. Finally, he recalled occasions when he had to intercede with the technical staff on the Plaintiff's contracts due to communications breakdowns.

The NASA Competitive Placement Plan ("the Plan"), Joint Exhibit 1, provides for the posting of written vacancy announcements when new positions become available. Each vacancy announcement lists and describes necessary skills for the position, known as KSAOC's (knowledge, skills, abilities and other characteristics).

The Plan also outlines procedures for filling open positions. NASA employees applying for a position are required to submit a Personal Qualifications Statement (Form SF–171) and a Supplemental Applicant Questionnaire in which the applicant and his supervisor rate the applicant with regard to each relevant KSAOC. Appli-

cants who meet the minimum qualifications of the position are then rated on a numerical scale by a rater or rating panel. The names of the five highest candidates are then placed in alphabetical order on a certificate which is provided to the selecting official (hereinafter referred to as the "Highly Qualified Certificate").[2] Any employee listed on this certificate is eligible for selection.

Joseph Saggio[3] decided, however, to depart from the Plan by increasing the number of names that would appear on the Highly Qualified Certificate. Saggio testified that because of his concern that the names of employees of long-standing were not appearing on the Highly Qualified Certificate, he asked that all applicant's names be listed if possible. He hoped that by allowing such employees the opportunity to reach the interview stage of the promotion procedure, he would improve morale.

As was described previously in the context of Baker's testimony, there had developed at NASA an informal system of inflated ratings. Simon confirmed this, stating that evaluators were encouraged to lean toward giving the highest rating when possible, to allow job applicants to have their names placed on the Highly Qualified Certificate. Simon explained that once an employee reached the stage where they were applying for jobs as Supervisory Contract Specialists, they were "professionals," and "deserved" the opportunity to "be in the running."

In August, 1983, Mr. Danielson acted upon Vacancy Announcement 83–127 ("83–127"), Joint Exhibit 2, and applied for promotion to the position of Supervisory Contract Specialist, GS–13. He was 56 years old at the time.

The vacancy announcement described the duties of the available job as follows:

> Serves as Section Head directing and participating in effecting and processing a variety of research and development

**2.** If there was no meaningful distinction between the applicants, then the number of names placed on the certificate could be increased to as many as ten.

**3.** Saggio was the selecting officer for many of the promotions for which the Plaintiff applied between 1980–1985, including the one directly at issue in the instant case. Saggio was 47 years old at the time of the incidents in question.

contracts in support of the Space Communications Division (6200), the Space Transportation Division (6300), and the Shuttle/Centaur Project Office (6400). Serves as Contracting Officer with signatory authority of $500,000. Functions as voting member of Source Evaluation Board when appointed. Assists in debriefing unsuccessful offerors. Attends meetings and conferences for anticipated procurements and proposed project requirements to plan method and source of procurements and other related matters. Plans, develops, guides and implements procedures and controls for the Section. Directs the activities of approximately six Contract Specialists and associated clerical personnel. Reviews their completed work for adherence to regulations and procedures, soundness of recommendations, solutions to problems and validity of recommendations for expenditure of funds and disposition of Government property. Reviews negotiations and price analysis memoranda prepared by Contract Specialists.

*See* Joint Exhibit 2; *see also* Joint Exhibit 3 (copy of positions description form). Five KSAOC's were also listed on VA 87-127. Listed as critical were: (1) "[k]nowledge of Federal procurement laws, rules, regulations and policies[;]" (2) "[a]bility to manage large and complex contracts[;]" and (3) "[a]bility to supervise personnel." *Id.* "Ability to communicate orally[,]" and "[a]bility to communicate in writing" were listed as important. *Id.*

In contrasting the job of Contract Specialist with that of Supervisory Contract Specialist, Saggio described the former as involving the shepherding of contracts through the maze of government regulations. In contrast, a Supervisory Contract Specialist had to assign and review the work of his subordinates. In addition, he had to have the ability to motivate, instruct and teach. Most importantly, he was the main procurement division contact with the scientists and engineers in the other branches of NASA.

The rating panel responsible for preparing the Highly Qualified Certificate for 83-127 rated the eight applicants as follows:

| | |
|---|---|
| Shirley L. Boyer | 98 |
| Richard W. Danielson | 92 |
| Robert L. Firestone | 91 |
| G.A. Goliwski | No rating |
| Eugene Schiopota | 91 |
| Bruce M. Shuman | 90 |
| Isadore T. Sonkin | 96 |
| George Virostek | 85 |

Joint Exhibit 5. Based upon this, all of the candidates except Goliwski were placed on the Highly Qualified Certificate. *See* Joint Exhibit 4. The Highly Qualified Certificate did not reflect the numerical ratings, and Saggio testified that he never saw the numerical evaluations.

After reviewing the application materials, talking to the branch chiefs, and interviewing the applicants, Saggio selected Firestone for the position described in 83-127. In his testimony, Saggio emphasized that his duty was to choose the best qualified applicant off the Highly Qualified Certificate. His decision, therefore, was not merely a choice between Danielson and Firestone.

Firestone, commenced his employment at the NASA Lewis Research Center on March 21, 1976, at which time he was hired as a GS-9/11 Contract Specialist. On April 16, 1980, he was promoted to a GS-12. At the time of his selection for the 83-127 promotion, Firestone was 36 years old.

Firestone had not earned an undergraduate degree at the time in question, but had accumulated the following credits: 15 semester hours at John Carroll University; 68 quarter hours at Cleveland State University; and 36 semester hours at Franklin University and Dyke College.

As both Danielson's and Firestone's first line supervisor, Bradley Baker prepared

evaluations for each individual's 83–127 promotion applications. *See* Joint Exhibits 8 & 9. In doing so, he described each applicant's abilities with regard to each of the five KSAOC's.

In the areas of "Knowledge of Federal Procurement Laws, Regulations and Policies" and "Ability to Communicate in Writing," both Danielson and Firestone were described as having demonstrated "superior quality of performance," the highest rating available. In addition both were described as having demonstrated "between superior and satisfactory quality of performance," the second highest rating available, in their "Ability to Supervise Personnel."

With regard to the "Ability to Manage Large and Complex Contracts," Danielson received the highest rating and Firestone received the second highest. Although the comments on this KSAOC were almost identical for each candidate, at trial Baker stated that Firestone's lower rating was based upon his inability to consistently meet deadlines. Baker added, however, that these delays were due, in part, to the heavy workload that Firestone carried.

In the area of "Ability to Communicate Orally," Firestone received the highest rating and Danielson the second highest. The comments for this KSAOC are the only ones which present substantially different descriptions of Firestone and Danielson. Danielson is described as "able to convert his ideas into speech and communicate clearly in both private and group presentations." In describing Firestone, however, Baker stated: "The applicant is able to *quickly* convert his ideas into speech and to communicate articulately, in both private conversations and in group presentations. Mr. Firestone has an excellent command of the English language and is naturally loquacious." [4]

In comparing Danielson to Firestone at trial, Baker stated that while each man exceeded the other on some of the KSAOC's, Firestone had a better rapport with the technical community, and had handled two of the largest contracts in the section.

Simon testified that at the time of the 83–127 decision, he believed that Firestone was better suited for the job than Mr. Danielson. His reason for this was that Firestone was more responsive to the technical staff. He described Firestone as a person who gives the impression of having a "now" approach, as compared with the Plaintiff who he felt was more laid back. Simon conceded that Danielson's style had not prevented him from accomplishing his intended goals, but it was his opinion that Firestone's approach presented a smoother road to the same result.

Saggio testified that Firestone was the best qualified candidate in terms of the ability to ultimately be a successful manager. He stated that Firestone was superior to the other candidates in the areas of leadership skills and ability to deal with subordinates, customers and engineers. In addition, he stated that although he routinely considered the KSAOC evaluations in making promotion decisions, they were rarely of help because all of the applicants generally had high ratings. When questioned about this on cross-examination, Saggio admitted that the promotion factors were highly subjective and that he relied to a large extent on what he termed "supervisory potential."

Saggio noted that Danielson had a reputation of being a bad communicator and that in times of stress he had difficulty with syntax and the communication of complicated ideas. He further stated, however, that Danielson's communications skills constituted only one minor factor in an overall evaluation which included consideration of educational background, prior management experience in other jobs, and demonstrated merits and capabilities.

---

**4.** Plaintiff's counsel made much of the fact that the word loquacious means "very talkative" or "overly talkative." It was clear, however, from the word's context and from Baker's testimony at trial that he was completely unaware of any negative implications that the word carried. In addition, the context was likely to also have alerted Saggio that Baker was attempting to praise Firestone.

Finally, Saggio testified that age played no part in any of his promotion decisions, and noted that he had previously passed over Firestone on other occasions in favor of candidates over the age of forty.

Danielson admits that Saggio made no remarks to him that would lead him to believe that age was a factor in the selection of Firestone. Danielson argued, however, that when the selection of Firestone is viewed in the context of prior statements and promotion determinations, it becomes clear that age was a factor.

Joint Exhibits 12 and 13 contain data on all promotions made in the Procurement Division of the Lewis Research Center between 1978 and 1987. By averaging the ages of those applying for promotions, the Plaintiff contends that the statistics demonstrate age bias in Saggio's promotion determinations for managerial positions. The government, on the other hand, alleges that the Plaintiff's calculations are skewed by the consistent presence in the selection pool of long-time employees who have been consistently denied managerial positions.

A close examination of the data bears out the government's theory. The Plaintiff has conveniently excluded from its summary Saggio's selections for non-supervisory positions. In three of these selections, 80–113, 81–70 and 84–6, Saggio chose individuals over the age of fifty while passing over numerous younger applicants. On another occasion, 85–16, he selected a thirty-nine year old over a mixed pool of older and significantly younger applicants.

Even if the examination is confined to those decisions upon which the Plaintiff relies, it is clear that the government's explanation of the statistics is highly plausible. The applicant pool from which Saggio made his selections was consistently peppered with the same names of individuals over forty. Specifically, the names Richard Danielson, Eugene Schiopota, Israel Sonkin, and Shirley Boyer appear over and over again. On many occasions where applicants under the age of forty were chosen, these four individuals were the only applicants over the age of fifty.

In addition, on three occasions, 81–17, 82–54 and 85–171, Saggio selected individuals over the age of forty ahead of numerous younger employees. On one of these occasions, 82–54, Mr. Firestone was one of the applicants in the pool who was passed over.

Further, on several occasions, 80–12, 80–18, 80–19, 80–36, Sonkin, Schiopota, Boyer and Danielson were passed over by other selecting officials in favor of individuals over the age of forty.[5]

As witnesses, the Plaintiff called Boyer, Schiopota, and Francis Driscoll, all of whom testified that they had been turned down for promotions by Saggio, and had reached the conclusion that age was a factor. Boyer presented the starkest evidence in support of her claim. In testifying, she stated that in her first interview with Saggio, his first question concerned how long she planned to stay with NASA and what her retirement plans were. Saggio stated that he did not recall the incident, but did not deny that he could have asked the question. He described it as a necessary question for purposes of long-term planning.

Finally, the Plaintiff presented Joint Exhibit 18, a document concerning the identification of management potential in employees, as evidence of an overall NASA focus on advancing younger employees. Plaintiff, however, did not base the instant action on a theory of pattern and practice. Instead, all of his evidence and argument focused on Saggio's 83–127 decision. Inasmuch as there was no evidence that Saggio ever saw this 1975 document before making the 83–127 promotion decision, it is of extremely questionable relevance.

## II. ANALYSIS AND CONCLUSIONS OF LAW

The ADEA embodies the important national policy that it is unlawful for an em-

---

**5.** It is important to note that all four of these selections occurred during the allegedly "non-discriminatory" period to which the Plaintiff compares the statistics of Saggio's promotion determinations.

ployer "to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). "To establish a violation of the Age Discrimination in Employment Act, [a plaintiff has] only to prove that age was *a* determining factor in [the adverse employment decision.]" *Wheeler v. McKinley Enterprises,* 937 F.2d 1158, 1162 (6th Cir. 1991) (citing *Chappell v. GTE Products Corp.,* 803 F.2d 261, 266 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987)).

■ The burden of production in an ADEA case is essentially the same as that in a case under Title VII. The Plaintiff initially bears the burden of establishing a prima facie case of age discrimination. Unlike Title VII cases, however, a plaintiff in an ADEA case may establish a prima facie case other than by proving all elements of the four factor test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

"There is a clearly enunciated rule in this circuit that age discrimination cases are to be decided on a 'case by case basis.' While this circuit allows the use of a modified version of the criteria set forth in *McDonnell Douglas* ... a mechanistic application of *McDonnell Douglas* has been explicitly discouraged." *Wanger v. G.A. Gray Co.,* 872 F.2d 142, 144 (6th Cir.1989) (citations omitted).

The modified *McDonnell Douglas* test requires the following showing to make a prima facie case:

A plaintiff raises a rebuttable presumption of discrimination by showing (1) he was a member of the protected class, (2) he received adverse employment action, (3) he was qualified, and (4) he was replaced by a younger person.

*Moody v. Pepsi–Cola Metropolitan Bottling Co., Inc.,* 915 F.2d 201, 208 (6th Cir. 1990) (citing *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 940 (6th Cir.1987)).

"The plaintiff can establish a prima facie case of age discrimination by using the *McDonnell Douglas* criteria. The plaintiff can also establish a prima facie case using statistical information, direct evidence of discrimination, and circumstantial evidence other than that which is used in the *McDonnell Douglas* criteria." *Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176, 1180 (6th Cir.1983). Essentially, "a discharged employee presents a prima facie case by introducing evidence that he was adversely affected by the defendant's employment decisions under circumstances which give rise to an inference of unlawful discrimination." *Wanger,* 872 F.2d at 145 (citations and internal quotation marks omitted).

■ It is clear that even under the *McDonnell Douglas* criteria the Plaintiff has made a prima facie case. There is no dispute that the Plaintiff is a member of the protected class. In addition, the Plaintiff was passed over for promotion to a job for which he was qualified. In light of the placement of Plaintiff's name on the Highly Qualified Certificate, the Defendant cannot, and at trial did not, contest that Plaintiff was qualified for the job. Further, it is undisputed that the promotion in question went to a younger employee. Plaintiff's showing raises a rebuttable presumption of discrimination. *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 940 (6th Cir.1987).

■ Once a plaintiff has made a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Wooden v. Board of Education of Jefferson County, Kentucky,* 931 F.2d 376, 378 (6th Cir.1991).

In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981), the Supreme Court held that a defendant meets its burden if it "clearly set[s] forth, through the introduction of admissible evidence, the reasons for plaintiff's [discharge]". It is not necessary that a defendant persuade the court that "it was actually motivated by the proffered reasons[,]" but "is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 254–55, 101 S.Ct. at 1094.

In the instant case, the Defendant claims that Danielson was not promoted because

Firestone was the best qualified candidate on the Highly Qualified List.

"Once the employer articulates a legitimate, nondiscriminatory reason for its action, any presumption of discrimination drops from the case, and the burden of persuasion rests squarely on the plaintiff." *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 514 (6th Cir.1991). "To meet this standard, [a plaintiff is] required to produce direct, indirect or circumstantial evidence that [his] age was a factor in the decision to terminate [him] and that 'but for' this factor [he] would not have been terminated." *Gagné v. Northwestern National Insurance Co.,* 881 F.2d 309, 314 (6th Cir.1989). "There [a]re three ways in which [an ADEA plaintiff can show] that [the] stated reason for firing him constituted mere pretext: (1) by showing that the stated reasons had no basis in fact, (2) by showing that they were not the actual reasons, and (3) by showing that they were insufficient to explain the [adverse employment action]." *Wheeler,* at 1162 (citing *Chappell,* 803 F.2d at 266.

■ In the instant case, the fact that the Plaintiff bears the burden is critical. Both parties presented highly credible witnesses. Although the Plaintiff presented probative evidence, it is clear that the preponderance of the evidence is not in support of his position.

The evidence indicates that there developed in the Procurement Division of the Lewis Research Center an "underclass" of hard-working, capable Contract Specialists who were at some point in their careers labelled as lacking managerial skills. Whether this assessment was founded or unfounded it stuck with them and dogged them in their repeated attempts for promotions. Rather than taking the bull by the horns and informing them of their position, their supervisors instead chose to enact a complex charade in which these individuals consistently received favorable reviews, were consistently listed as qualified for promotions, but were repeatedly denied promotions.

Mr. Saggio described this as an attempt to raise morale by giving long-standing employees at least the opportunity to interview for the listed positions. At the very least, it seems odd to reward decades of loyal work with a deceitful practice which doomed the members of this underclass of employees to failure before they even applied.

The question, however, is not whether NASA treated their employees in a decent and honorable manner. The question is whether age was a determining factor in the decision not to promote Mr. Danielson in August 1983. The Defendant has stated that the decision was based upon the fact that Mr. Firestone was the better qualified candidate due to Mr. Danielson's weak communications skills and lack of managerial potential. The burden, therefore, rests with Mr. Danielson to prove that the Defendant's stated reason is pretextual.

It is clear that if the selecting official's determination that Firestone was the best candidate was legitimate, it is a sufficient justification for not selecting Danielson. In addition, an independent analysis of the record indicates that there is a factual basis for the conclusion that Firestone was the best qualified candidate for the 83–127 opening. It is important to remember that the 83–127 selection involved numerous candidates, not just Danielson and Firestone. A review of Firestone's qualifications viewed in conjunction with the descriptions of his abilities presented by his supervisors, supports the conclusion that Firestone was highly qualified for the job.

It is equally clear from the bulk of the testimony of Danielson's supervisors that he had been labelled as not being of management caliber. Thus, although in some areas Danielson appeared more qualified on paper, he carried with him extra baggage. It was, to be sure, an invidious labelling, in that it was accomplished by means of a whispering campaign and never brought out in Danielson's formal reviews. This labelling, however, appears to have arisen from subjective assessments of Danielson's ability, rather than because of his age.

Saggio admitted during his testimony that his selections were highly subjective,

focusing on "management potential." In discussing this type of subjective decision-making the Sixth Circuit has stated:

> Courts have frequently noted that subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination.... Moreover, the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority.... Obviously the more subjective the qualification and the manner in which it is measured, the more difficult it will be for the defendant to meet the burden imposed by the court in *Burdine.* Subjective employment evaluations, however, are not illegal per se. The ultimate issue in each case is whether the subjective criteria were used to disguise discriminatory action.

*Grano v. Dept. of Development of the City of Columbus,* 699 F.2d 836, 837 (6th Cir.1983) (internal quotation marks and citations omitted). Accordingly, it is necessary to determine whether the Plaintiff has proven that the stated reason for his non-promotion, i.e. that Firestone was the best qualified candidate for the job, was not the actual reason behind Saggio's decision.

There are two substantial facts that support the Plaintiff's position in this area. First, the remarks of Saggio to Boyer could be construed to indicate an interest in the age of the applicant. As has been noted elsewhere, however, "[i]n order to plan for the future of a department, a manager must be able to ask the employees whether any of them plan to move out of the area, or to return to school, or to leave their positions for any other reasons." *Murray v. Sears, Roebuck and Co.,* 722 F.Supp. 1500, 1505 (N.D.Ohio 1989). In *Murray,* the court concluded that questions about retirement were not *per se* discriminatory. *Id.* It is clear that managers must be allowed to make inquiries regarding their employees future plans. Standing alone, therefore, Saggio's remark is insufficient to prove pretext.

Perhaps the most significant evidence of pretext is the fact that the Defendant was carrying out a fraud against its employees in an attempt to keep them placated. Although Saggio's explanation for the inflated ratings and expanded applicant pools is highly plausible, the mere existence of this system casts a shadow over the credibility of those who put it into effect. In other words, the fact that Saggio was willing to act out this charade, raises questions about the credibility of his claim that age played no role in his promotion determinations.

The court, however, had the opportunity to observe Saggio during his extended testimony, and found him to be highly credible. As was stated previously, this case comes down to the burden of proof. Both sides have presented probative evidence, but the Plaintiff has simply failed to carry his burden. The evidence concerning the ratings system, even viewed in conjunction with the testimony regarding Saggio's statement to Boyer, is insufficient to prove that the Defendant's stated reason for not promoting Danielson was pretextual.

Inasmuch as the Plaintiff has failed to carry his burden of proving that age was a determining factor in the decision not to promote him, judgment is rendered in favor of the Defendant.

IT IS SO ORDERED.